IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOVAN ALI #315917
        Plaintiff       :

 v.                          :      CIVIL ACTION NO. DKC-09-0466

CORRECTIONAL MEDICAL SERVICES,  :
INC.,
        Defendant      :

## **MEMORANDUM**

I      PROCEDURAL HISTORY

Plaintiff, a prisoner within the Maryland Division of Correction, filed this civil rights action while confined at the North Branch Correctional Institution in Cumberland ("NBCI") on February 25, 2009. He alleges that a scalp condition requiring specialized treatment, first diagnosed and treated during a period of incarceration in 2004, was ignored for more than nine months following his 2007 return to the Maryland Division of Correction. Paper Nos. 1 at 5 and and 13 at 2. Plaintiff acknowledges that the condition resolved after the specialist properly diagnosed it and prescribed medications. Paper No. 1 at 10. He seeks money damages and declaratory relief wherein Defendants' failure to act quickly to resolve his condition would be found violative of the Eighth Amendment. Paper No. 1 at 4-6. Plaintiff also seeks a permanent injunction ordering Defendants to continue to provide adequate treatment for his condition. *Id*.

II.     PENDING MOTIONS

Currently pending before the court is a Motion to Dismiss or, in the Alternative, for Summary Judgment filed on behalf of Correctional Medical Services, Inc. (CMS) and all but one of the named medical employees,[1] and Plaintiff's opposition thereto. Paper Nos. 10 and 13. The

---

[1] Nurse Practitioner Ann Hammond was not served with process. Plaintiff alleges she made three notations

undersigned has examined the medical records and affidavits submitted by the parties and finds that no hearing is necessary. *See* Local Rule 105.6. (D. Md. 2008). For reasons to follow, Defendants' pleading, construed as a motion for summary judgment, shall be granted.

III.    STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

---

in the medical record summarizing his problems and was aware of his condition and his need to see a specialist since July 30, 2007. Paper No. 1 at 9. As this action does not demonstrate Nurse Hammond's deliberate indifference to Plaintiff's medical problems, had she been served summons in this case, she would have been entitled to summary judgment. As it stands, Hammond shall be dismissed from the case.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, a court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

IV.  ANALYSIS

As an inmate sentenced to confinement, Plaintiff is entitled to receive reasonable treatment for serious medical needs. Plaintiff must prove two essential elements. First, he must satisfy the "objective" component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). Assuming Plaintiff's conditions satisfy this first element, he must next prove the subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of prison officials or health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose

of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837.

Some question exists as to whether Plaintiff suffers from a serious medical condition. On March 21, 2007, the day he returned to the Division of Correction, Plaintiff was examined by Doctor Verendra Chhunchha. Plaintiff informed Chhunchha that he had been previously diagnosed with tinea capitis (TC),[2] had fair success using ketoconazole[3] cream, and did not find steroid injections into affected scalp areas effective. Paper No. 10, Exhibit A ¶ 3 and Exhibit B at 1-4. The doctor found multiple patches of alopecia (hair loss) all over Plaintiff's scalp but no bleeding or discharge. *Id*. Plaintiff was prescribed ketoconzole to apply twice a day to the affected areas of scalp. *Id*, Exhibit B at 3. A week later, Plaintiff was transferred from the Maryland Reception Diagnostic and Classification Center to North Branch Correctional Institution (NBCI). While at NBCI, Plaintiff's ketoconazole cream was renewed on several occasions. *Id*., Exhibit B at 6-9, 11-12, 34-35.

By August 7, 2007, Plaintiff was reporting that the ketoconazole cream was not fully effective and that steroid injections might again be needed. *Id*., Exhibit B at 13. He was scheduled for examination by a physician. On August 31, 2007, Plaintiff was examined by Dr. Masoud Djahanmir, who felt that oral antifungal medications might bring relief. *Id*., Exhibit B at 16. Because such medications can impact the liver, Dr. Djahanmir scheduled liver function tests prior to and during the one-month medication regimen. *Id*., Exhibit B at 16-20. Some improvement was obtained as a result of the treatment. *Id*., Exhibit B at 22.

---

[2] Tinea capitis is a common form of fungus infection of the scalp caused by various species on the hair shafts. It occurs most commonly in children and is characterized by irregularly placed and variously sized patches of apparent baldness caused by hairs breaking off at the scalp's surface, scaling, black dots, and occasionally redness and pyoderma (pus). *See Stedman's Medical Dictionary* (27th Ed. 2000) at 1837.

[3] Ketoconazole is a broad spectrum antifungal agent used to treat systemic and topical fundal infections.

Plaintiff placed several sick-call requests to see a physician when the condition flared again in November of 2007. *Id*., Exhibit B at 22-26. On December 11, 2007, Dr. Djahanmir examined him, assessed a problem with tinea capitus, and prescribed ketoconazole cream.[4] Djahanmir noted Plaintiff's request to see a dermatologist and scheduled a "MSP" visit for January of 2008. *Id*., Exhibit B at 27-28.

Plaintiff was scheduled to see a physician's assistant (PA) concerning his scalp condition on several occasions in January, February and March of 2008. *Id*., Exhibit B at 30, 32-33. Scheduled appointments with the PA do not appear to have been kept, and Plaintiff was rescheduled to see the PA on May 7, 2008. That appointment, too, was not kept. *Id*., Exhibit B at 30, 32-33, 37-40. A May 8, 2008 appointment in the Chronic Care Clinic (CCC) also was not kept,[5] but Plaintiff was scheduled to see the PA for steroidal injections of the scalp.

On June 15, 2008, Plaintiff filed a sick call request complaining of painful bumps on the head. Nurse Warnick examined Plaintiff on June 18, 2008, and found one small raised area on the left crown and several patchy bald spots. Plaintiff informed Warnick he had drained the bump and that the drainage resembled that from a pimple. The area was inflamed but Plaintiff denied pain once the area was drained. Plaintiff was given Bacitracin, a topical antibiotic ointment, for the area. *Id*., Exhibit B at 41-42. Plaintiff became disenchanted with promises to reschedule with the PA, and refused a July 20, 2008 nurse visit, instead requesting to see a specialist. *Id*., Exhibit B at 43-46.

On August 7, 2008, Nurse Practitioner Hammond ordered a dermatology consultation for Plaintiff. *Id*., Exhibit B at 47. On August 26, 2008, Doctor Ken H. Roberts, a dermatologist,

---

[4] There is some question as to whether Plaintiff upon occasion ran out of cream because it was not readily available in the prison pharmacy. Paper No. 10, Exhibit B at 29, 31, 34-35.

[5] It appears the appointments with the physician's assistant were not kept because the PA was not available. The parties dispute whether Plaintiff refused to keep the May 8, 2008 appointment in the CCC or a July 20, 2008 nurse visit. *Id*., Exhibit B at 40, 44, 51. The dispute is not material to the outcome of this case.

performed a biopsy of Plaintiff's scalp and determined he suffered from a type of scalp condition known as alopecia areata (AA).[6]  Alopecia areata is a common condition of undetermined cause characterized by circumscribed, nonscarring, asymmetrical areas of baldness on the scalp and beard. *See Stedman's Medical Dictionary* (27th ed.) at 50.  AA, which may be an inherited condition or an autoimmune problem, may also cause hair loss on the body. *Id.*  The bald patches enlarge slowly and regrowth of hair within a year is common, although relapse is frequent and the patches may increase over time. *Id.*, p. 50.  Dr. Roberts believed Plaintiff's condition was hereditary and brought on by stress. *Id.* at 52  He prescribed Lidex, a topical steroid, for the scalp and Westcort, a different type of steroidal medication, for Plaintiff's beard. *Id.*, Exhibit B at 47-52, 55-56.  Because the medications are not part of the formulary regularly carried in the prison pharmacy, they must be obtained from outside sources upon the order of a physician. *Id*, Exhibit B at 53.  It appears that Plaintiff must seek refills on a regular basis and some delay in receiving the medication does occur periodically.[7] *Id.,* Exhibit B at 57, 60-61, 65-68, 71, 73-74, 76-84, 86-97, 99-106.  He has had at least one additional infection on a patch of scalp which caused him discomfort.  The infection resolved with the use of antibiotics. *Id.*, Exhibit B at 53-54, 57—64.

Plaintiff suffers from a dermatological problem that affects the scalp, causing discomfort and patchy baldness.  The condition is likely hereditary and is exacerbated by stress.  The symptoms mimic other scalp conditions, as evidenced by the difference in diagnostic opinions between the treating physician who diagnosed tinea capitis in 2004, Dr. Roberts's diagnosis of

---

[6] The court notes that the biopsy did not confirm Dr. Roberts's diagnosis: the pathologist opined that the specimen more closely resembled androgenetic alopecia, a hormonal-linked cause of hair loss.  Paper No. 10 at 56.  Dr. Roberts opined that the overall clinical picture supported his diagnosis, and suggested testing to rule out a thyroid problem as the cause of the AA.  Paper No. 10, Exhibit B at 52, 55.  Plaintiff notified medical staff in November of 2008 and January of 2009 that the testing had yet to be scheduled. *Id.,* Exhibit B at 75 and 85.  Bloodwork occurred on January 13, 2009, and thyroid problems were ruled out as a cause of Plaintiff's condition.  Paper No. 1 at 9.

[7] Despite some delay, Plaintiff's stitches were removed from the biopsy site without complication. *Id.*, Exhibit B at 60.

alopecia areata, and the different diagnosis suggested by the pathologist to whom Roberts sent biopsy material. For the purpose of this action, the court will assume the condition constitutes a serious medical condition.

Plaintiff's complaint centered around the nine months that elapsed between the time he first informed health care providers that his condition no longer responded to prescribed treatment and the time he was provided access to a specialist who properly diagnosed the condition and initiated a more effective course of treatment. During that time, Plaintiff was provided the same treatment that had worked, with mixed results, in the past. While this conduct may have amounted to less than optimal care, it does not rise to the level of "deliberate indifference." Furthermore, there is no indication that medical personnel believed a substantial risk of serious harm would result from delay in referring Plaintiff to a specialist.

V.      CONCLUSION

For the aforementioned reasons, the court finds no Eighth Amendment violation and declines to exercise supplemental jurisdiction to consider Plaintiff's state tort claims. Defendants' Motion for Summary Judgment shall be granted. A separate order follows.

Date:   August 24, 2009                    _____/s/_____
                                            DEBORAH K. CHASANOW
                                            United States District Judge